AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

SEALED

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Texas

NORTHERN DISTRICT OF TEXAS
FILED

MAY - 3 2019

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>All funds in Wells Fargo account xxxx5452<br>in the name of National IRPR Corp. | )<br>)<br>)<br>)<br>) |

Case No.    3:19-MJ-
## 3 - 1 9 M J 4 0 9 - B T

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Northern_____ District of _____Texas_____ is subject to forfeiture to the United States of America under _____18_____ U.S.C. § _____981, 982_____ *(describe the property)*:

All funds in Wells Fargo account xxxx5452 in the name of National IRPR Corp.

The application is based on these facts:

See attached affidavit of Postal Inspector Jan G. Bodón.

☑ Continued on the attached sheet.

_____
*Applicant's signature*

Jan G. Bodón, Postal Inspector, U.S. Postal Inspection Service
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __May 3, 2019__

City and state: _____Dallas, Texas_____

_____
*Judge's signature*

United States Magistrate Judge Rebecca Rutherford
_____
*Printed name and title*

**AFFIDAVIT**

I, Jan G. Bodón, being first duly sworn state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized to request a seizure warrant.

2.      I am a Postal Inspector employed by the U.S. Postal Inspection Service. I have been a Postal Inspector since April 2004. As part of my current duties, I investigate instances of fraud including, but not limited to, those involving the use of the United States Postal Service. I received my basic training as a criminal investigator at the U.S. Postal Service Academy in Potomac, Maryland. Over the years, I have received training in the areas of financial fraud and white collar crime. I have been the case agent in numerous criminal investigations. I have authorized and sworn to numerous affidavits in support of federal search warrants, federal arrest warrants, and federal warrants for seizure of property subject to forfeiture.

3.      On March 5, 2019, Cengiz Jan Comu (a/k/a CJ Comu), Harley E. Barnes, III (a/k/a Buddy Barnes), John Mervyn Price, Richard Laurence Kadish, Richard Lawrence Green, and Daniel Thomas Broyles, Sr. were charged in a twenty-one count indictment (the "Indictment"), for their roles in a five-year-long high-yield investment fraud. The scheme involved EarthWater Limited (f/k/a EarthWater PLC) and its subsidiaries EarthWater Inc., FulHum Inc., ZenFul Inc., FulHum Global Inc. ("FulHum Global"), and EWB International Inc. (collectively, "EarthWater"). Comu is EarthWater's founder, Chief Executive Officer (CEO), and Chairman. Barnes is EarthWater's Chief Financial Officer (CFO). Price was formerly EarthWater's Chief Operating Officer. Kadish, Green and Broyles were unlicensed salespeople

who promoted and sold EarthWater stock. The defendants were indicted for making a series of materially false and misleading representations to victims to induce them to purchase more than $10 million in EarthWater stock, in violation of 18 U.S.C. §§ 1349 (conspiracy), 1341 (mail fraud), 1343 (wire fraud), and 2 (aiding and abetting).

4.      Based on my knowledge of this case and my training and experience as a criminal investigator, as described more fully below, there is probable cause to believe that the defendants committed additional violations of federal law, including 18 U.S.C. §§ 1956 and 1957 (money laundering).

5.      The statements in this affidavit are based upon information I learned during the investigation, information provided to me by other law enforcement agents, Confidential Human Sources (CHS), witnesses, public records, and business records.

6.      Because this affidavit is being submitted for the limited purpose of securing seizure warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that the property to be seized is derived from proceeds of the target offenses.

## PROPERTY FOR SEIZURE

7.      This affidavit is made to obtain a seizure warrant for the following accounts and property:

a.      All funds in Bank of America account xxxx2037 in the name of EWB International (hereinafter, the "Investment Account");

b.      All funds in Bank of America account xxxx8213 in the name of EWB International (hereinafter, the "Operating Account");

c.      All funds in Bank of America account xxxx3449 in the name of Fulhum Global (hereinafter, the "FulHum Global Account");

d.      All funds in Bank of America account xxxx3345 in the name of Regus Advisors Inc. (hereinafter, the "Regus Account");

e.      All funds in Bank of America account xxxx8516 in the name of Ultimate Sales Inc.; and

f.      All funds in Wells Fargo account xxxx5452 in the name of National IRPR Corp.

## LEGAL AUTHORITY FOR SEIZURE

8.      Based on my training, I know property subject to forfeiture is subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and seizure via a criminal seizure warrant under 18 U.S.C. § 982(b) and 21 U.S.C. § 853(f), as shown below.

9.      Additionally, based on my training, I know that property subject to forfeiture pursuant to 18 U.S.C. § 981(a) is subject to seizure pursuant to 18 U.S.C. § 981(b). Further, 18 U.S.C. § 984 provides that, in any forfeiture action in rem in which the subject property is funds deposited in an account in a financial institution, the government does not have to identify or trace the funds involved in the offense which is the basis for the forfeiture; it is no defense that those funds have been removed and replaced by other funds; and identical funds found in the same account as the funds involved in the forfeiture offense are subject to forfeiture. In essence, Section 984 allows the government to seize for forfeiture identical property found in the same place where the "guilty" property had been kept. However, Section 984 does not allow the government to reach back in time for an unlimited period; a forfeiture action (including a seizure) against property not directly traceable to the offense which is the basis for the forfeiture cannot be commenced more than one year from the date of the offense.

### 18 U.S.C. § 1341 (Mail Fraud)

10.     18 U.S.C. § 981(a)(1)(C) subjects to civil forfeiture any property, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1341, which constitutes a specified unlawful activity.

11.     28 U.S.C. § 2461(c) authorizes criminal forfeiture where a criminal law has been violated and civil forfeiture is authorized in connection with the offense.

### 18 U.S.C. § 1343 (Wire Fraud)

12.     18 U.S.C. § 981(a)(1)(C) subjects to civil forfeiture any property, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343, which constitutes a specified unlawful activity.

13.     28 U.S.C. § 2461(c) authorizes criminal forfeiture where a criminal law has been violated and civil forfeiture is authorized in connection with the offense.

### 18 U.S.C. § 1349 (Conspiracy to Commit Fraud)

14.     18 U.S.C. § 981(a)(1)(C) subjects to civil forfeiture any property, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1349, which constitutes a conspiracy to commit a specified unlawful activity.

15.     28 U.S.C. § 2461(c) subjects to criminal forfeiture any property for which civil forfeiture is authorized.

### 18 U.S.C. §§ 1956 and 1957 (Money Laundering):

16.     18 U.S.C. § 981 subjects to civil forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C.] section 1956, 1957 . . . , or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A).

17.     18 U.S.C. § 982 subjects to criminal forfeiture "any property, real or personal, involved in a violation of [18 U.S.C. §§ 1956 or 1957], or any property traceable to such property." 18 U.S.C. § 982(a)(1).

## FACTS SUPPORTING PROBABLE CAUSE

18.     As set forth in the Indictment, with which I am familiar, the defendants and others, targeted victim investors by telephone and email to induce those victim investors to purchase EarthWater stock. To induce victim investors to purchase EarthWater stock, the defendants and others made numerous false and fraudulent representations, both in direct exchanges with victim investors and through published and publicly posted materials. As described in the Indictment:

a.      These false and fraudulent representations included, among other things, that EarthWater's stock was marketable, on the verge of an initial public offering (IPO), merger or acquisition, and would have a value of at least $5.00 per share after the IPO, merger or acquisition. The defendants and others then falsely represented that victims had only a brief opportunity to purchase EarthWater stock for anywhere from $0.10 - $0.50 per share in an unregistered offering—thus promising a high-yield return on victims' investments.

b.      The defendants and others falsely represented to victim investors verbally and in a Private Placement Memorandum ("PPM"), executive summary, PowerPoint presentation, and other promotional materials they drafted and distributed to victim investors that EarthWater would use ninety (90) percent of invested funds for new product development, global license and distribution, product inventories, marketing and public relations, working capital, legal/accounting/advisory, and cost contingencies. The defendants and others also falsely represented to victim investors verbally and in a PPM, executive summary, PowerPoint presentation, and other promotional materials they drafted and distributed to victim investors that

fees paid to a broker-dealer with respect to sales of EarthWater shares in the unregistered offering (or "placement fees") shall not exceed ten (10) percent of the purchase price of the shares.

        c.      For example, in the version of the PPM dated March 1, 2017, which was produced pursuant to a search warrant for various email accounts, EarthWater told prospective investors that "fees paid to a Broker/Dealer with respect to sales of the Shares . . . shall not exceed ten percent (10%) of the purchase price of the Shares plus expenses."  EarthWater also made detailed representations about its use of the proceeds in charts and tables contained in the PPM, including, for example, the following pie chart and table, which was copied directly from the March 1, 2017 PPM:



| Use of Proceeds | Amount in USD |
|---|---|
| New Product Development | 250,000 |
| Global License and Distribution | 400,000 |
| Product Inventories | 1,500,000 |
| Marketing and PR | 1,500,000 |
| Working Capital | 500,000 |
| Legal/Accounting/Advisory | 250,000 |
| Cost contingencies | 100,000 |
| Placement Fees | 500,000 |
| Total | 5,000,000 |

Similar statements were made in other documents EarthWater used to pitch investors, including a one-page executive summary of the PPM and a PowerPoint presentation.

        d.    The defendants and others falsely represented to victim investors verbally and in a PPM they drafted and distributed to victim investors that EarthWater's officers and employees,

including Comu, Barnes and Price, did not receive salaries from EarthWater in 2014, 2015 or 2016.

e.      To obtain victims' money, the defendants and others instructed victim investors to mail or wire payments for EarthWater stock to EarthWater.  Victim investors' funds were deposited or wired directly into the Investment Account.

f.      Once a victim investor's funds were deposited into the Investment Account, Comu, Price, and Barnes paid sales commission payments totaling approximately forty-five (45) to fifty (50) percent of the victim's funds to the bank account(s) of the co-conspirator(s) who had contacted the victim investor and induced the victim investor to purchase EarthWater stock, including Kadish and Green.

19.    Review of documents obtained pursuant to search warrants of various email accounts and bank records revealed that:

a.      Kadish, who sells EarthWater stock, owns and controls Energy Farms, Inc. ("Energy Farms") and its successor National IRPR, Inc. ("National IRPR"), which are corporate shells that Kadish has used, and currently uses, to do EarthWater-related business.  Kadish deposited his commissions for the sale of EarthWater stock in a Wells Fargo account in the name of Energy Farms until February 2017, when he closed that account.  Since that time, Kadish has deposited his commissions for the sale of EarthWater stock in Wells Fargo account xxxx5452 in the name of National IRPR.

b.      Green, who also sells EarthWater stock, owns and controls Ultimate Sales, Inc. ("Ultimate Sales"), which is a corporate shell Green uses to do EarthWater-related business. Green deposits his commissions for the sale of EarthWater stock in Bank of America account xxxx8516 in the name of Ultimate Sales.

20.   Review of documents obtained pursuant to search warrants of various email accounts and bank records also revealed that, in addition to the Investment Account, Comu, Barnes and Price controlled at least three other bank accounts in the name of EarthWater or related entities, including:

    a.   The Operating Account in the name of EWB International;

    b.   Bank of America account xxxx3449 in the name of FulHum Global; and

    c.   Bank of America account xxxx3345 in the name of Regus.

21.   EWB International and FulHum Global are EarthWater subsidiaries.  Regus, however, is a company owned and controlled by Comu.  Based on my investigation, I understand that Comu uses Regus as a conduit to funnel money to himself and his co-conspirators.  In 2014, in connection with proceedings involving Comu's personal bankruptcy, the United States Bankruptcy Court for the Northern District of Texas found that Comu had established Regus "with the specific fraudulent intent of continuing [a] lucrative business under a new alter ego in furtherance of his scheme to hinder, delay and defraud his creditors by concealing and dissipating assets attributable to the estate."  *In re Cengiz J. Comu*, Adv. No. 10-03269-SGJ, 2014 WL 3339593, at *25 (Bank. N.D. Tex. July 8, 2014).  Review of documents obtained pursuant to search warrants of various email accounts and bank records revealed that, following the conclusion of his personal bankruptcy case, Comu continued to use Regus to conduct business and continued to use the Bank of America account Comu opened in Regus's name.

22.   As described below, Comu, Barnes and Price transferred victim funds between these four accounts and used them to pay themselves salaries (including in 2014, 2015 and 2016, when they told victim investors that they were not receiving any salaries), and for their own personal benefit.

23.   The defendants' use of the victim investors' funds were therefore not to develop and operate EarthWater as represented in the PPM, executive summary, PowerPoint presentation, and other promotional materials they drafted and distributed to victim investors.

## FINANCIAL ANALYSIS

### *Proceeds Theory*

24.   As set forth in the Indictment, the defendants told victim investors that ninety (90) percent of their money would be reinvested in EarthWater and that, at most, ten (10) percent would be used to pay "placement fees" (including the payment of commissions).  In truth, Comu, Barnes and Price paid Kadish and Green half of the money that Kadish and Green (or individuals working for Kadish and Green) raised from victim investors.  Comu, Barnes and Price paid Kadish and Green using checks from the Investment Account and Operating Account which were deposited in National IRPR's Wells Fargo account xxxx5452 and Ultimate Sales' Bank of America account xxxx8516:



25.   As of January 31, 2019, Comu, Barnes and Price had paid $1,198,861.00 to Green at Ultimate Sales, all of which was derived from proceeds of victim investor funds.  Since May 3, 2018, Comu and Barnes had paid $194,625.00 to Green at Ultimate Sales, all of which was derived from proceeds of victim investor funds.

26.   As of January 31, 2019, Comu, Barnes and Price had paid $1,355,774.50 to Kadish

at National IRPR, all of which was derived from proceeds of victim investor funds. As indicated in the diagram, $3,650 of the victim investor funds had been initially deposited into Kadish's Energy Farms account but was later transferred by Kadish to the National IRPR account. Since May 3, 2018, Comu and Barnes had paid $21,625.00 to Kadish at National IRPR, all of which was derived from proceeds of victim investor funds.

### Money Laundering Theory

27.    As detailed below, the victim investor funds deposited into the Investment Account were transferred to other accounts owned and controlled by Comu, Price or Barnes, in furtherance of the fraudulent scheme, and to conceal or disguise the nature, location, source, ownership or control of the funds.

28.    The laundering of victim investments occurs through the interchanging of funds between the four accounts associated with EarthWater and Regus:



**INVESTMENT ACCOUNT**

29.     The majority of victim investor funds were deposited into the Investment

Account.  The Investment Account was opened December 11, 2013 and has been maintained

until at least January 31, 2019.  Aside from $2,684,200.00 in loans from two lenders and some

miscellaneous credits to the account (that are comparatively minor in amount), the Investment

Account consists primarily (69%) of victim investor funds.  To date, the victim investor funds

total at least $8,524,413.49.  Below is a representation of the source of funds in the Investment

Account as of January 31, 2019:

**Credits – December 11, 2013 to January 31, 2019**

| Items | Category | Total Value | Remitter |
|---|---|---|---|
| 505 | Investor Funds | $8,524,413.49 | Victims |
| 6 | Loan | $2,684,200.00 | Ward Capital LP; Samuel G. Rose[1] |
| 3 | Inter Bank Transfer | $29,000.00 | From Operating Account |
| 1 | Inter Bank Transfer | $30,000.00 | From Fulhum Global Account |
| 3 | Inter Bank Transfer | $220,000.00 | From Regus Account |
| 320 | Other[2] | $846,527.10 | Various |

**Debits - January 11, 2013 to January 31, 2019**

| Items | Category | Total Value | Beneficiary |
|---|---|---|---|
| 422 | Commissions | $3,752,766.50 | Salespeople |
| 249 | Inter Bank Transfer | $4,412,624.75 | To Operating Account |
| 42 | Inter Bank Transfer | $177,900.00 | To Fulhum Global Account |
| 111 | Inter Bank Transfer | $1,208,900.00 | To Regus Account |
| 4638 | Miscellaneous | $417,742.49 | Various (no identifiable business purpose) |
| 278 | Other[3] | $2,388,768.22 | Various |

---

[1] Based on my investigation, I understand that Ward Capital LP and Samuel G. Rose acted as lenders to EarthWater and may also be victims of the alleged fraud.

[2] These transactions include: sales deposits from payment processors, transfers from other non-target bank accounts, and banking adjustments.

[3] These transactions include: transfers to other non-target bank accounts, banking adjustments, fees, travel expenses, marketing expenses, operating expenses, and charitable donations.

30.    The Investment Account was often utilized as EarthWater's expense account. Comu, Barnes and Price, at some point in the history of the account, each possessed a debit card linked to the Investment Account. Numerous debit card transactions appeared to be for the personal benefit of Comu, Barnes or Price as they had no identifiable business purpose. This is represented in the "Miscellaneous" category above under "Debits." These were instances in which checks, transfers, or card transactions were debited from the account to pay for various seemingly personal expenses.  Notable amongst these are: $19,267.54 spent at Amazon; $80,215.65 spent at restaurants and bars, $52,254.49 spent at retail stores (*e.g.*, Target, Walmart, Best Buy, and others); $22,653.66 spent at golf courses; and $13,425.75 spent on executive club expenses.  Comu, Barnes and Price are therefore using corporate debit cards to conceal transactions for their own personal benefit.

31.    Accordingly, there is probable cause to believe that any and all funds contained in the Investment Account are either derived directly from proceeds of the victim investments or are used to conceal the movement of such funds for the benefit of Comu, Barnes and Price.

32.    Since December 11, 2013, the Investment Account engaged in numerous transactions involving victim investor funds greater than $10,000.00 in violation of 18 U.S.C. § 1957, including the following examples: $20,500.00 transferred from the Investment Account to the Operating Account on October 27, 2014; $21,000.00 transferred from the Investment Account to the Regus Account on November 11, 2016; $50,000.00 transferred from the Investment Account to the Regus Account on March 15, 2018.

**REGUS ACCOUNT**

33.     Based on the investigation to date, at various points during the relevant time period, Comu, Barnes and Price each controlled the Regus Account. The Regus Account was opened October 13, 2013 and has been maintained until at least January 31, 2019.  Below is a representation of the source of funds in the Regus Account as of January 31, 2019:

**Credits – October 13, 2013 to January 31, 2019**

| Items | Category | Total Value | Remitter |
|---|---|---|---|
| 111 | Inter Bank Transfer | $1,208,900.00 | From Investment Account |
| 2 | Inter Bank Transfer | $17,000.00 | From Operating Account |
| 34 | Other | $102,739.29 | Various |

**Debits – October 13, 2013 to January 31, 2019**

| Items | Category | Total Value | Beneficiary |
|---|---|---|---|
| 179 | Payroll/ Reimbursement | $371,360.02 | Comu, Price, Barnes, additional employees, and Payroll Processors |
| 3 | Inter Bank Transfer | $220,000.00 | To Investment Account |
| 1 | Inter Bank Transfer | $4,000.00 | To Operating Account |
| 75 | Miscellaneous | $16,629.69 | Various (personal benefit/no identifiable business necessity) |
| 532 | Other | $305,169.28 | Various |

32.     The Regus Account was primarily utilized as a vehicle to move funds from the Investment Account to Regus to disguise these transfers as legitimate payroll expenses made to Comu, Barnes and Price (at a time when EarthWater represented to victim investors that it was not paying Comu, Barnes or Price salaries).  Such use is consistent with the Bankruptcy Court's finding that Regus was created for the specific and fraudulent purpose of concealing and dissipating assets. *In re Cengiz J. Comu*, Adv. No. 10-03269-SGJ, 2014 WL 3339593, at *25 (Bank. N.D. Tex. July 8, 2014).

33.     Additionally, $600,000.00 was transferred from the Investment Account to the

Regus Account on November 30, 2018. Shortly thereafter, in January 2019, two transfers totaling $200,000.00 were made back to the Investment Account. The nature and intent of these transfers is presently unknown, however, based on my experience and training, this type of exchange is consistent with the act of money laundering.

34.     Accordingly, there is probable cause to believe that any and all funds contained in the Regus Account are either derived directly from proceeds of the victim investments or are used to conceal the movement of such funds to the benefit of the co-conspirators.

35.     In addition, since October 13, 2013, the Regus Account has engaged in numerous transactions in victim investor funds greater than $10,000.00 in violation of 18 U.S.C. § 1957, including the following: $15,000.00 transferred from the Investment Account to the Regus Account on May 18, 2015; $600,000.00 transferred from the Investment Account to the Regus Account on November 30, 2018; and $100,000.00 transferred from the Regus Account to the Investment Account on January 3, 2019.

**OPERATING ACCOUNT**

36.     Based on the investigation to date, at various points during the relevant time period, Comu, Barnes and Price each controlled the Operating Account. It was opened August 11, 2014 and has been maintained until at least January 31, 2019. Below is a representation of the source of funds in the Operating Account as of January 31, 2019:

**Credits – August 11, 2014 to January 31, 2019**

| Items | Category | Total Value | Remitter |
|---|---|---|---|
| 250 | Inter Bank Transfer | $4,412,624.75 | From Investment Account |
| 2 | Inter Bank Transfer | $49,360.00 | From Regus Account |
| 409 | Other | $864,412.54 | Various |

**Debits - August 11, 2014 to January 31, 2019**

| Items | Category | Total Value | Beneficiary |
|---|---|---|---|
| 3 | Inter Bank Transfer | $29,000.00 | To Investment Account |
| 6 | Inter Bank Transfer | $30,900.00 | To Fulhum Global Account |
| 2 | Inter Bank Transfer | $17,000.00 | To Regus Account |
| 7 | Commissions | $93,750.00 | National IRPR, Energy Farms, and other Salespeople[4] |
| 944 | Payroll/ Reimbursements | $1,587,290.76 | Various Individual and Payroll Processors |
| 1907 | Other | $3,515,778.47 | Various |

37.     The Operating Account was utilized much in the same way as the Investment Account.  The Operating Account was also used as a source of formal (payroll) compensation for Comu, Barnes and Price, including during the time that they told victim investors they were not receiving salaries. With 94% of the credits consisting of funds transferred from the Investment Account, victim investor funds had been utilized to cover a majority of the expenses in this account, including the payment of excessive commissions to Comu, Barnes and Price's co-conspirators; payment of personal expenses disguised as business expenses (*e.g.*, over $58,000.00 spent on vehicle leases); the transfer of funds to Regus for the personal benefit of Comu, Barnes and Price; and payroll expenses used to disguise the transfer of victim investor funds for the personal benefit of Comu, Barnes, and Price.  The Operating Account supported a majority of the payroll-related expenses for EarthWater (including Comu, Barnes and Price), serving as the source for over $1.5 million in such payments.

---

[4] Commissions were primarily paid out of the Investment Account; however, a small number of commissions were also paid out of the Operating Account.

38.     Accordingly, there is probable cause to believe that any and all funds contained in the Operating Account are either derived directly from proceeds of the victim investments or are used to conceal the movement of such funds to the benefit of the co-conspirators.

39.     In addition, since August 11, 2014, the Operating Account has engaged in numerous transactions in victim investor funds greater than $10,000.00 in violation of 18 U.S.C. § 1957, including the following: $333,000.00 transferred from the Investment Account to the Operating Account on March 21, 2018; $70,000.00 transferred from the Investment Account to the Operating Account on April 16, 2018; and $95,000.00 transferred from the Investment Account to the Operating Account on May 30, 2018.

## FULHUM GLOBAL ACCOUNT

40.     Based on the investigation to date, at various points during the relevant time period, Comu, Barnes and Price each controlled the FulHum Global Account. This account was opened May 10, 2016 and has been maintained until at least January 31, 2018. Below is a representation of the source of funds in the FulHum Global Account as of January 31, 2019:

### Credits – May 10, 2016 to January 31, 2019

| Items | Category | Total Value | Remitter |
|---|---|---|---|
| 3 | Banking | $226.00 | Transfers from other accounts, cash deposits, refunds, adjustments, etc. |
| 42 | Inter Bank Transfer | $177,900.00 | From Investment Account |
| 6 | Inter Bank Transfer | $30,900.00 | From Operating Account |
| 1 | Loan | $49,480.00 | Sprout Funding[5] |

---

[5] Sprout Funding is a commercial lender to small businesses.

**Debits – May 10, 2016 to January 31, 2019**

| Items | Category | Total Value | Beneficiary |
|---|---|---|---|
| 1565 | Compensation | $97,142.50 | Various Contractors |
| 18 | Banking | $75,798.60 | Transfers to other accounts, Cash withdrawals, fees, adjustments, etc. |
| 1 | Inter Bank Transfer | $30,000.00 | To Investment Account |
| 1 | Inter Bank.Transfer | $45,360.00 | To Operating Account |
| 97 | Loan Payment | $60,600.00 | Sprout Funding |
| 1 | Operating | $5,000.00 | BPM Consulting LLC |

41.     Since opening in May of 2016, the Fulhum Global Account had very limited activity until May of 2018.  Based on my review of bank records, approximately 69% of funds in the FulHum Global Account were victim investor funds transferred by or at the direction of Comu, Barnes or Price from the Investment Account.  One of the primary activities to note in the FulHum Global Account was the transfer of funds between that account and the other EarthWater accounts, without any identifiable business purpose.  Based on my experience and training, this movement of funds out of and back into accounts is consistent with the laundering of money.

42.     Accordingly, there is probable cause to believe that any and all funds contained in the Fulhum Global Account are either derived directly from proceeds of the victim investments or are used to conceal the movement of such funds to the benefit of the co-conspirators.

43.     18 U.S.C. § 1957 makes it a crime to knowingly engage, or attempt to engage, in a monetary transaction with proceeds of a specified unlawful activity, *i.e.*, wire fraud, mail fraud, conspiracy to commit the same, etc., in an amount greater than $10,000.00 by, through, or to, a financial institution.  Here, since May 10, 2016, the FulHum Global Account has engaged in a transaction in victim investor funds greater

than $10,000.00 in violation of 18 U.S.C. § 1957.  Specifically, on June 21, 2018,

there was a $30,000.00 transfer from the Investment Account to the FulHum

Global Account.  The $30,000.00 transfer constitutes a monetary transaction with

the proceeds of a wire fraud, mail fraud, and conspiracy to commit the same, in an

amount greater than $10,000.00, by through, and to a financial institution, namely,

Bank of America.  Accordingly, there is probable cause to believe that all funds in

the FulHum Global Account are seizable.

I declare under penalty of perjury that the foregoing is true and correct.

Jan Bodón, U.S. Postal Inspector
United States Postal Inspection Service

Sworn and subscribed to before me on this 3rd day of May 2019.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE